IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

NO. 19-1481

HAMID ADELI
APPELLEE

VS.

SILVERSTAR AUTOMOTIVE, INC. d/b/a MERCEDES-BENZ OF
NORTHWEST ARKANSAS
APPELLANT

Appeal from the United States District Court
for the Western District of Arkansas
Fayetteville Division

HONORABLE PAUL K. HOLMES, III

BRIEF AND ADDENDUM OF APPELLANT SILVERSTAR
AUTOMOTIVE, INC. d/b/a MERCEDES-BENZ OF NORTHWEST
ARKANSAS

David M. Donovan
Staci Dumas Carson
Watts, Donovan & Tilley, P.A.
200 River Market Avenue, Suite 200
Little Rock, AR 72201
(501) 372-1406

## SUMMARY OF THE CASE

Appellant Silverstar Automotive, Inc. d/b/a Mercedes-Benz of Northwest Arkansas (Silverstar), an Arkansas automobile dealership, sold a used car to Appellee Hamid Adeli (Adeli), a Virginia resident pursuant to a written contract. Adeli filed suit claiming that Silverstar misrepresented the condition of the car (APX 001-011). The jury found in Adeli's favor, awarding him $6,835 in compensatory damages, $13,366 in incidental damages, and $5,800,000 in punitive damages (APX 161-163).

Silverstar filed post-trial motions for judgment as a matter of law and to alter or amend the judgment (APX 164-165, 166-167). The district court denied the motion for judgment as a matter of law and granted in part the motion to alter or amend judgment reducing the punitive damages to $500,000 (ADD 003-014; APX 542-552).

Silverstar requests 15 minutes for oral argument.

Appellate Case: 19-1481    Page: 2    Date Filed: 05/21/2019 Entry ID: 4789737

# CORPORATE DISCLOSURE STATEMENT

Silverstar Automotive, Inc., is a privately held corporation.  There are no publicly traded entities which own any interest in Silverstar Automotive, Inc.

Appellate Case: 19-1481    Page: 3    Date Filed: 05/21/2019 Entry ID: 4789737

# TABLE OF CONTENTS

SUMMARY OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

CORPORATE DISCLOSURE STATEMENT.. . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii

JURISDICTIONAL STATEMENT.. . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

I.      THE DISTRICT COURT ERRED IN DENYING
        SILVERSTAR'S MOTION FOR JUDGMENT AS
        A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        A.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        B.      The breach of express warranty claim, based
                on pre-contract oral statements and text messages,
                is precluded by the express terms of the complete
                final written contract.. . . . . . . . . . . . . . . . . . . . . . . . .  13

                1.      The Arkansas Uniform Commercial Code,
                        (UCC) governed this transaction and any
                        warranties were effectively disclaimed in
                        compliance with the UCC . . . . . . . . . . . . . . . . . . . . .  13

Appellate Case: 19-1481     Page: 4     Date Filed: 05/21/2019 Entry ID: 4789737

2. The written contract was a final and complete
expression of the parties' agreement............... 15

    a. The separate down payment and
payment of the balance did not create
a non-integrated contract .................. 20

    b. A formal integration clause is not
required for application of the parol
evidence rule. ........................... 22

C. The fraud claim fails as a matter of law
because the contract, and Adeli's conduct,
preclude justifiable reliance, a necessary
element for the cause of action. ..................... 23

D. The ADTPA claim fails as a matter of law
because the transaction was in full compliance
with the law and was therefore not a
deceptive act. ..................................... 26

II. THE PUNITIVE DAMAGES AWARD DEPRIVES
SILVERSTAR OF ITS CONSTITUTIONAL
DUE PROCESS RIGHTS AND VIOLATES
ARKANSAS LAW. ................................... 27

A. Standard of Review................................ 29

B. Application of the constitutional guideposts
requires substantial reduction of the
punitive damages.................................. 29

1. Silverstar's conduct was not reprehensible. ........ 31

iv

a.      Any loss suffered by Adeli
was purely economic. . . . . . . . . . . . . . . . . . . . . 31

b.      Adeli was not financially vulnerable.. . . . . . . . . 31

c.      The alleged misconduct by Silverstar
was limited to this transaction only. . . . . . . . . . 32

d.      Silverstar's alleged misconduct did not
evince a reckless disregard for health
and safety of others. . . . . . . . . . . . . . . . . . . . . . 33

e.      Silverstar's alleged misrepresentations
did not rise to the level of intentional
malice, trickery, or deceit.. . . . . . . . . . . . . . . . . 36

2.      Comparison of the compensatory to the
punitive damages requires further reduction
of the punitive award. . . . . . . . . . . . . . . . . . . . . . . 39

a.      The punitive damages should be
compared to the compensatory damages
only, not the incidental and
compensatory damages combined. . . . . . . . . . . 42

b.      The compensatory damage award
was not small or nominal.. . . . . . . . . . . . . . . . . 44

c.      <u>Grabinski</u> does not support the
district court's punitive damage
award.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

3.   The punitive damages award is grossly
     disproportionate to potentially
     applicable Arkansas civil penalties. . . . . . . . . . . . . 48

C.   The punitive damages award is not authorized
     by Arkansas law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     1.   The large punitive damages cannot stand
          under Arkansas state law criteria. . . . . . . . . . . . . . 50

     2.   The Arkansas courts consistently adhere
          to the <u>Campbell</u> parameter. . . . . . . . . . . . . . . . . . . . 54

     3.   The <u>Grabinski</u> case, decided under Missouri
          law, is contrary to Arkansas law. . . . . . . . . . . . . . . 58

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . 60

ADDENDUM TO BRIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ADDENDUM TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . 62

vi

# TABLE OF AUTHORITIES

**CASES**                                                                Page(s)

Advocat, Inc. v. Sauer
    353 Ark. 29, 111 S.W.3d 346 (2003). . . . . . . . . . . . . . . . . 51, 58

Allstate Ins. Co. v. Dodson
    2011 Ark. 19, 376 S.W.3d 414 (2011). . . . . . . . . . . . . . . . . . 51

Armstrong Remodeling & Const., LLC v. Cardenas
    2012 Ark. App. 387, 417 S.W.3d 748 (2012). . . . . . . . . . . . . . 23

Bennett v. Bumble Bee Foods, LLC
    2014 U.S. Dist. LEXIS 188460 (W.D. Ark. Oct. 8, 2014). . . . . 43

Black Hills v. Hubbard
    203 F.2d 859 (8th Cir. 1953). . . . . . . . . . . . . . . . . . . . . . . . . . 13

BMW of N.A., Inc. v. Gore
    517 U.S. 559, 116 S. Ct. 1589 (1996). . . . . . . . . . . 30, 39, 43, 49

Boerner v. Brown & Williamson Tobacco Co.
    394 F.3d 594 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 30, 42

Cate v. Irvin
    44 Ark. App. 39, 866 S.W.2d 423 (1993). . . . . . . . . . . . . . . . . 15

Caterpillar Tractor Co. v. Waterson
    13 Ark. App. 77, 679 S.W.2d 814 (1984). . . . . . . . . . . . . . . . . 14

Country Corner Food & Drug v. First State Bank & Tr. Co.
    332 Ark. 645, 966 S.W.2d 894 (1998). . . . . . . . . . . . . . . . . . . 23

Appellate Case: 19-1481    Page: 8    Date Filed: 05/21/2019 Entry ID: 4789737

Crowell v. Campbell Soup Co.
    264 F.3d 756 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Davidson v. Wilson
    973 F.2d 1391 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 25

Epley v. John Gibson Auto Sales
    2016 Ark. App. 540, 514 S.W.3d 468 (2016). . . . . . . . . . . . . 2, 24

Farmers Co-op. Assn. v. Garrison
    248 Ark. 948, 454 S.W.2d 644 (1970). . . . . . . . . . . . . . . . . . . . 16

Feltmann v. Sieben
    108 F.3d 970 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Grabinski v. Blue Springs Ford Sales, Inc.
    1998 U.S. Dist. LEXIS 17015 (W.D. Mo. 1998), aff'd.
    203 F. 3d 1024 (8th Cir. 2000), cert. denied
    531 U.S. 825 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Grand Lab. v. Midcon Labs
    32 F.3d 1277 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Double G Trucking of the Arklatex, Inc.
    432 B.R. 789 (Bankr. W.D. Ark. 2010). . . . . . . . . . . . . . . . . . . . 22

Jeter v. Windle
    229 Ark. 948, 319 S.W.2d 825 (1959). . . . . . . . . . . . . . . . . . . . 17

Jim Ray, Inc. v. Williams
    99 Ark. App. 315
    260 S.W.3d 307 (2007). . . . . . . . . . . . . . . 2, 45, 50, 54, 55, 56, 57

Johnson v. United States
    434 F.2d 340 (8th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Appellate Case: 19-1481    Page: 9    Date Filed: 05/21/2019 Entry ID: 4789737

L.L. Cole & Son, Inc. v. Hickman
    282 Ark. 6, 665 S.W.2d 278 (1984). . . . . . . . . . . . . . . . . . . . . . . 43

Martin v. American Fam. Mut. Ins. Co.
    157 F.3d 580 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Montwood Corp. v. Hot Springs Theme Park Corp.
    766 F.2d 359 (8th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Morse v. Southern Union Co.
    174 F.3d 917 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ondrisek v. Hoffman
    698 F.3d 1020 (8th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . 2, 29, 40

Plymouth Foam Products, Inc. v. City of Becker, Minn.
    120 F.3d 153 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Quigley v. Winter
    598 F.3d 938 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Rainey v. Travis
    312 Ark. 460, 850 S.W.2d 839 (1993). . . . . . . . . . . . . . . . . . . . 16

Routh Wrecker Service v. Washington
    335 Ark. 232, 980 S.W.2d 240 (1998). . . . . . . . . . . . . . . . . . . . 51

Shelton v. Kennedy Funding, Inc.
    622 F.3d 943 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Skalla v. Canepari
    2013 Ark. 415, 430 S.W.3d 72 (2013). . . . . . . . . . . . . . . . . . . . 27

Appellate Case: 19-1481    Page: 10    Date Filed: 05/21/2019 Entry ID: 4789737

State Farm Mut. Auto. Ins. Co. v. Campbell
    538 U.S. 408 (2003). . . . . . . . . . . . . . . . . . 28, 30, 40, 41, 43, 56

Stogsdill v. Healthmark Partners, L.L.C.
    377 F.3d 827 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 41

Trickey v. Kaman Indus. Techs. Corp.
    705 F.3d 788 (8th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 29

Union Pacific R.R. v. Barber
    356 Ark. 268, 149 S.W.3d 325 (2004). . . . . . . . . . . . . . 51, 52, 53

Wallace v. DTG Operations, Inc.
    563 F.3d 357 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 40, 41, 44

Walt Bennett Ford, Inc. v. Dyer
    4 Ark. App. 354, 631 S.W.2d 312 (1982). . . . . . . . . . . . . 2, 13, 22

Williams v. ConAgra Poultry Co.
    378 F.3d 790 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 41

Yarborough v. DeVilbiss Air Power, Inc.
    321 F.3d 728 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 2, 25

## STATUTES/RULES

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ark. Code Ann. § 4-2-102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Ark. Code Ann. § 4-2-105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

x

Ark. Code Ann. § 4-2-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Ark. Code Ann. § 4-2-313. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Ark. Code Ann. § 4-2-316. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Ark. Code Ann. § 4-88-103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Ark. Code Ann. § 4-88-107. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Ark. Code Ann. § 4-88-113. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

Ark. Code Ann. § 5-4-401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Appellate Case: 19-1481    Page: 12    Date Filed: 05/21/2019 Entry ID: 4789737

# JURISDICTIONAL STATEMENT

Federal jurisdiction was based on diversity of citizenship.  28

U.S.C. § 1332.  The district court entered a final judgment resolving all

claims of all parties (ADD 002; APX 553).  Silverstar filed a timely

Notice of Appeal (APX 554-555).  This Court has appellate jurisdiction

pursuant to 28 U.S.C. § 1291.

1

# STATEMENT OF ISSUES

1.    Whether the district court erred in denying Silverstar's

motion for judgment as a matter of law.

   • <u>Walt Bennett Ford, Inc. v. Dyer</u>, 4 Ark. App. 354, 631 S.W.2d
   312 (1982)

   • <u>Yarborough v. DeVilbiss Air Power, Inc.</u>, 321 F.3d 728 (8th Cir.
   2003)

   • <u>Epley v. John Gibson Auto Sales</u>, 2016 Ark. App. 540, 514
   S.W.3d 468 (2016)


2.    Whether the award of punitive damages deprived Silverstar of

its constitutional due process rights and violated Arkansas law.

   • <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408
   (2003)

   • <u>Ondrisek v. Hoffman</u>, 698 F.3d 1020 (8th Cir. 1999)

   • <u>Jim Ray, Inc. v. Williams</u>, 99 Ark. App. 315, 260 S.W.3d 307
   (2007)

Appellate Case: 19-1481    Page: 14    Date Filed: 05/21/2019 Entry ID: 4789737

## STATEMENT OF THE CASE

Adeli responded to an online advertisement regarding the sale by Silverstar of a 2007 F340 Ferrari automobile (the car) (TR 77; APX 243). Before offering the car for sale, Silverstar had it inspected by Boardwalk Ferrari (Boardwalk), a Ferrari dealership in Dallas, Texas. The car was shipped to Boardwalk which performed a pre-purchase inspection (PPI) on October 10, 2016 (TR 150; APX 316).

Michael Slone (Slone), a Silverstar associate and son of the owner, discussed the car with Boardwalk service advisor Larry Neighbors (Neighbors). Slone and Neighbors discussed repair issues with the car, including potential exhaust leaks (the exhaust). The specifics of the discussion between Neighbors and Slone about the exhaust were disputed at trial. Silverstar paid approximately $12,000 for recommended repairs, and declined any repairs to the exhaust, which were estimated at $5,865 (TR 188; APX 354). Neighbors gave Slone a Boardwalk document itemizing repairs and costs (APX 128-131) (the report).

3

Slone and Adeli negotiated the sale by telephone and text message (TR 85; APX 251, 567-573). Slone provided Adeli the report which listed repairs performed and a declined repair (tire pressure monitoring system – TPMS). The report did not list the exhaust as a declined repair. Slone and Adeli did not discuss the exhaust in their negotiations (TR 286; APX 452). They agreed on a price of $90,000 (TR 90; APX 256).

Another prospective buyer learned about the exhaust issue from Boardwalk and asked Slone about it. Slone e-mailed Boardwalk on November 15, 2016 confirming his discussion with Neighbors that it was a "beginning crack" which "was not included in the PPI." (APX 559). Neighbors forwarded to Slone an internal Boardwalk document listing the exhaust as a declined repair (APX 559, 561).

Adeli did not inspect the car before purchase.

The following written contract documents were executed dated November 17, 2016:

- Buyers Guide, stating that the car was sold "AS IS – NO

4

WARRANTY.  YOU (PURCHASER) WILL PAY ALL COSTS FOR

ANY REPAIRS.  The dealer assumes no responsibility for any repairs[.]"

(APX 043).

• Buyers Order itemizing price and including DISCLAIMER OF

WARRANTIES stating:  "The above named Dealership, hereby expressly

disclaims all warranties, either express or implied[.]"  (APX 039).

• Odometer Disclosure Statement (APX 040).

• No cooling off period notice (APX 042).

Adeli made a $2,000 down payment through credit card (TR 129;

APX 295).  The balance of the purchase price was paid by check dated

November 21, 2016 (APX 041).

The car was shipped from Arkansas to Virginia arriving on

November 27, 2016 (TR 92; APX 258).  Adeli noticed the smell of

gasoline (TR 94; APX 260).  He had the car towed to a mechanic for

inspection and later to Ferrari of Washington, a Ferrari dealership (TR

96, 104; APX 262, 270).

Adeli complained to Slone and the general manager of Silverstar,

5

Joshua Guest (Guest). Adeli sought recision of the sale (TR 98, 105; APX 264, 271). Guest called Neighbors who confirmed that the Boardwalk inspection had been thorough and that all repairs necessary for the sale of the car had been completed. Silverstar therefore declined to rescind the sale (TR 264-266; APX 430-432).

The inspection at Ferrari Washington was performed by Joseph Easton (Easton). He identified the exhaust and the TPMS as repair needs. He also identified numerous repair items not discovered by Boardwalk: left-side fuel pump causing fuel leak (TR 48; APX 214), joint and strut bushings (suspension) (TR 47, 61; APX 213, 227), and valve cover baskets (TR 62; APX 228).

Adeli filed suit seeking compensatory and punitive damages (APX 1-11). After discovery, both sides moved for summary judgment (APX 023-043, 047-087). The Court denied both motions ruling that Adeli's claims for breach of express warranty, common law fraud, and the Arkansas Deceptive Trade Practices Act (ADTPA) remained for trial (APX 145-160).

Appellate Case: 19-1481    Page: 18    Date Filed: 05/21/2019 Entry ID: 4789737

Trial was held on September 25-26, 2018. Slone testified that he was told by Neighbors the exhaust was not a necessary repair but was only a beginning issue, not a crack, which would need to be addressed at some point in the future (TR 277-278; APX 443-444). Guest testified that Neighbors confirmed these statements when he investigated following Adeli's complaints (TR 249-251, 265-266; APX 415-417, 431-432).

Neighbors testified that the exhaust was a recommended repair which should have been authorized, but Slone declined (TR 204-205; APX 370-371). Neighbors could not recall the conversation with Guest, but his notes documented a call (TR 208-209; APX 374-375, 566).

Silverstar had no knowledge prior to the sale of a gas leak, suspension issue, or safety concern related to the exhaust.

Easton testified that the exhaust, gas leak, and suspension were potential safety issues.

Adeli testified that he was told by Slone that the car was "turnkey, ready to go." (TR 85; APX 251). The text message stated "all the

7

service was completed" by Boardwalk (APX 569).

Adeli spent $18,303 in repairs (TR 111-115; APX 277-281, 563), $6,036 of which was for the exhaust (Ex. 24A; APX 562). He suffered no physical injury. He did not offer evidence of any depression or anxiety. He testified that the sale caused tensions with his wife (TR 116; APX 282).

Silverstar moved for judgment as a matter of law at the close of the evidence. The district court denied this motion (TR 308-315; APX 474-481). The district court instructed the jury on fraud, breach of express warranty, and ADTPA (TR 328-341; APX 494-507). Punitive damage instructions were given (TR 327-328; APX 493-494).

The jury returned with a verdict of $6,835 in compensatory damages, $13,366 in incidental damages, and $5,800,000 in punitive damages.

Following entry of judgment on the jury verdict (APX 163), Silverstar filed a post-trial motion for judgment as a matter of law (APX 164-165) and motion to alter or amend the judgment (APX 166-167).

8

The district court denied the motion for judgment as a matter of law (ADD 014-018; APX 537-541). It granted in part the motion to alter or amend reducing the punitive damages to $500,000 (ADD 003-013; APX 542-552).

Appellate Case: 19-1481    Page: 21    Date Filed: 05/21/2019 Entry ID: 4789737

## SUMMARY OF ARGUMENT

The parties entered into a written contract that the car was sold "as is," disclaiming any warranties by Silverstar. The parties agreed that Adeli was responsible for all repairs. The alleged misrepresentations by phone and text message could not alter the express written contract terms as a matter of law. Judgment should have entered on the breach of the warranty claim as a matter of law. Judgment should have been entered on the fraud claim as a matter of law because Adeli could not have reasonably relied on the alleged pre-contract statements. Judgment on the ADTPA should have been entered as a matter of law because the transaction complied with applicable law and Silverstar's conduct did not violate the ADTPA. This Court should reverse and order dismissal of Adeli's lawsuit with prejudice, or order amendment of the judgment in accordance with its ruling on the three causes of action.

Alternatively, this Court should further reduce the punitive damages. The constitutional guideposts for a de novo review of punitive damages require reduction of the punitive damages to within a single

10

digit ratio of the compensatory award.

Appellate Case: 19-1481    Page: 23    Date Filed: 05/21/2019 Entry ID: 4789737

**ARGUMENT**

I.    THE DISTRICT COURT ERRED IN DENYING SILVERSTAR'S
      MOTION FOR JUDGMENT AS A MATTER OF LAW.

      A.    Standard of Review

The denial of a motion for judgment as a matter of law is reviewed

de novo applying the same standard as the district court.  Shelton v.

Kennedy Funding, Inc., 622 F.3d 943, 950 (8th Cir. 2010); Feltmann v.

Sieben, 108 F.3d 970, 974 (8th Cir. 1997).  The Court must: "(1)

resolve direct factual conflicts in favor of the nonmovant; (2) assume as

true all facts supporting the nonmovant which the evidence tended to

prove; (3) give the nonmovant the benefit of all reasonable inferences;

and (4) affirm the denial of the motion if the evidence so viewed would

allow reasonable jurors to differ as to the conclusions that could be

drawn."  Grand Lab. v. Midcon Labs, 32 F.3d 1277, 1280 (8th Cir.

1994).  "A proper motion for judgment as a matter of law will always

preserve for review the question whether under applicable law there was

an adequate evidentiary basis for the submission of the case to the jury."

Id. at 1281, citing Johnson v. United States, 434 F.2d 340, 343 (8th Cir.

12

1970), quoting <u>Black Hills v. Hubbard</u>, 203 F.2d 859, 862 (8th Cir. 1953).

B. <u>The breach of express warranty claim, based on pre-contract oral statements and text messages, is precluded by the express terms of the complete final written contract.</u>

1. <u>The Arkansas Uniform Commercial Code (UCC)governed this transaction and any warranties were effectively disclaimed in compliance with the UCC.</u>

The Arkansas UCC applies to sales of goods. Ark. Code Ann. § 4-2-102. Automobiles are goods, the sale of which is governed by the UCC. Ark. Code Ann. § 4-2-105(i); <u>see</u> <u>Walt Bennett Ford, Inc. v. Dyer</u>, 4 Ark. App. 354, 355, 631 S.W.2d 312, 313 (1982).

Ark. Code Ann. § 4-2-313 governs the creation of express warranties:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the

13

description.

It is not necessary that the seller use formal words such as "warrant" or "guarantee," but mere affirmations of the value of the goods or a seller's opinion or commendation of same does not create a warranty. § 4-2-313(2).

By written agreement, the parties may exclude warranties. Ark. Code Ann. § 4-2-316(1):

> (1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (§ 4-2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.

"A disclaimer of warranties limits the seller's liability by reducing the number of circumstances in which the seller will be in breach of the contract; it precludes the existence of a cause of action" for breach of warranty. Caterpillar Tractor Co. v. Waterson, 13 Ark. App. 77, 82, 679 S.W.2d 814, 818 (1984).

The UCC parol evidence rule is codified at Ark. Code Ann. § 4-2-

14

202:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

Id.  The parol evidence rule is a rule of substantive law:

> The parol evidence rule prohibits the introduction of extrinsic evidence, parol or otherwise, which is offered to vary the terms of a written agreement; it is a substantive rule of law, rather than a rule of evidence, and its premise is that the written agreement itself is the best evidence of the intention of the parties.

Cate v. Irvin, 44 Ark. App. 39, 43, 866 S.W.2d 423, 425 (1993)

(citations omitted).  The issue is whether the written contract was a final

expression of the parties' agreement thereby disclaiming any express

warranty.

      2.    The written contract was a final and complete expression of the parties' agreement.

The application of the parol evidence rule is contingent on a

15

finding that a contract exists which is intended by the parties as a final expression of their agreement. Rainey v. Travis, 312 Ark. 460, 464, 850 S.W.2d 839, 841 (1993). The burden is on the party seeking to avoid application of the parol evidence rule to affirmatively prove that the contract was not a fully integrated expression of the parties' agreement. Farmers Co-op. Assn. v. Garrison, 248 Ark. 948, 953, 454 S.W.2d 644, 647 (1970). In Garrison, the Court held:

> The parol evidence rule fixes the subject matter for interpretation, though not itself a rule of interpretation.
>
> . . . The rule as applied to contracts is simply that as a matter of law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), becomes the contract of the parties. The point then is, not how the agreement is proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself.

Id. at 954, 454 S.W.2d at 647. Regarding the requirements for a complete integration, the Court ruled:

> When a written instrument contains such terms as

16

> import a complete obligation, which is definite
> and unambiguous, it is conclusively presumed that
> the whole agreement of the parties, and the extent
> and manner of their undertaking, were reduced to
> writing.

Id. (quoting Jeter v. Windle, 229 Ark. 948, 319 S.W.2d 825 (1959)).

The sales documents executed by Adeli constitute a final expression of the parties' agreement. The contract consisted of: (1) Buyer's Order (APX 039); (2) Odometer Disclosure statement (APX-040); (3) Buyer's Guide (APX 043); and (4) no cooling off notice (APX 042).

The Buyer's Order signed by Adeli stated:

> DISCLAIMER OF WARRANTIES: Any
> warranties on the products sold hereby are those
> made by the manufacturer(s) of those products.
> The above named Dealership, hereby expressly
> disclaims all warranties, either express or implied.

> The Buyer's Guide signed by Adeli stated:

> AS IS – NO WARRANTY.

> YOU WILL PAY ALL COSTS FOR ANY
> REPAIRS. The dealer assumes no responsibility
> for any repairs regardless of any oral statements.

These documents disclaimed any alleged pre-contract affirmations

Appellate Case: 19-1481    Page: 29    Date Filed: 05/21/2019 Entry ID: 4789737

by Silverstar.  Adeli testified:

> Q.    Well, you knew the dealership was not giving you any warranties.
>
> A.    That's correct, yes.
>
> Q.    So there was no express warranty at all given by the dealership.
>
> A.    There was no warranties that I knew of on the car, that's correct.
>
> . . .
>
> Q.    And those negotiations were back and forth, both by phone and by text message?
>
> A.    That's correct.
>
> Q.    But you knew that the text messages, once you negotiated the price, would be followed by written contract documents?
>
> A.    Yes.
>
> Q.    And the contract documents would control the transaction between the parties?
>
> A.    Yes, that's correct.

(TR 132–133; APX 298-299).

Guest testified:

> Q. Just so I'm clear on this, there were text messages you were shown between Michael Slone and Mr. Adeli before the contract documents are signed. From your perspective as the general manager, are those text messages part of the contract?
>
> A. No, not at all.
>
> Q. Why is that?
>
> A. Any conversations we have with customers, both in their favor and in our favor, that are prior to any signed documents are part of the negotiations.

(TR 260; APX 426). This testimony is consistent with the express warranty disclaimer in the invoice and the "as-is" language in the Buyer's Guide. Thus, the parol evidence ruled excluded from the contract any pre-contract statements and text messages.

While Adeli testified on cross that he knew Silverstar offered no express warranty (TR 132, APX 298), he testified on re-direct that "as-is" meant no manufacturer's warranty (TR 091; APX 257) claiming that "as-is," essentially meant "as previously represented by" Silverstar (TR 158; APX 324). This convenient hindsight interpretation is rejected by

19

the unambiguous language of the written contract which plainly states that "the dealership . . . disclaims all warranties" and that "the dealer assumes no responsibility for any repairs" (emphasis added).

### a. The separate down payment and payment of the balance did not create a non-integrated contract.

The district court noted that the Buyer's Order referenced a $2,000 deposit, and that the check for the remainder of the purchase price was not for the full sale price (ADD 015; APX 538), holding that a question of fact therefore remained for the jury as to what documents the parties intended to be incorporated into their final agreement. Id. The Court further ruled that it was proper for the jury to consider the pre-contract text messages to decide which documents constituted the final agreement, and that the jury could reasonably determine that the messages were, in fact, part of the agreement in the form of an express warranty (ADD 016; APX 539).

The district court's ruling was erroneous. The parties did not dispute the sale price listed in the invoice at trial. Adeli consistently testified, both in deposition and at trial, that he agreed to pay $2,000 of

20

the purchase price in the form of a down payment, with the remainder of the purchase price to be paid by check. (APX 035, Adeli deposition excerpt, exhibit to Silverstar's motion for summary judgment; TR 129–130; APX 295-296, Adeli trial testimony).

Thus, both parties agreed that the price listed in the Buyer's Order was the contract price, and that payment would consist of a $2,000 down payment, and a check for the remainder of the price. This is established by the Buyer's Order, which lists the total price as $90,129, with $2,000 as cash on deposit, and $88,129 as cash paid on delivery (APX 039). There is no ambiguity in the invoice concerning this contract term.

The fact that the purchase price was paid by down payment and the balance by check has no relevance to whether the parties intended the written sales documents to be the final expression of their agreement. On the issue of warranty/repair responsibility, the documents could not be more definitive. The parties agreed in writing that Silverstar offered no warranty on this ten year old car, and that any and all repairs were

21

Adeli's responsibility.

        b.    <u>A formal integration clause is not required for application of the parol evidence rule.</u>

The district court noted that the contract documents did not include a merger clause. "Therefore the documents are not clearly a final expression of their agreement." (ADD 015; APX 538). Arkansas law, however, does not require a formal merger clause in order to find that the documents are a final expression of the agreement.

A writing containing a merger clause is a final expression of the agreement. <u>See</u> <u>In re Double G Trucking of the Arklatex, Inc.</u>, 432 B.R. 789, 795 (Bankr. W.D. Ark. 2010). However, the presence of a merger clause in the contract is not necessary to make this finding. This Court, applying Arkansas law, held that "the absence of [a merger clause] does not preclude application of the parol evidence rule," but that "such absence is relevant in determining whether the parties intended to integrate their entire agreement into the document involved in the case." <u>Montwood Corp. v. Hot Springs Theme Park Corp.</u>, 766 F.2d 359, 362 (8th Cir. 1985) (citing <u>Walt Bennett Ford, Inc.</u>, 631 S.W.2d at 313));

22

see also <u>Armstrong Remodeling & Const., LLC v. Cardenas</u>, 2012 Ark. App. 387, 8, 417 S.W.3d 748, 754 (2012) (holding that the lack of a merger clause is only "an indication" that the parties did not intend the writing to be the final agreement).

The contract documents agreed to by the parties in this case addressed all terms of the agreement. Other than the topic of potential repairs, Adeli does not claim that the written contract leaves unresolved any aspect of the agreement. The final written contract is specific and unequivocal on the potential repair topic: Adeli would pay for all repairs and Silverstar offered no warranty. <u>All</u> of the terms of the parties' agreement, including the potential for future repairs, were embodied in the final written agreement.

  C. <u>The fraud claim fails as a matter of law because the contract, and Adeli's conduct, preclude justifiable reliance, a necessary element for the cause of action.</u>

Justifiable reliance is a necessary element of a fraud cause of action. <u>Country Corner Food & Drug v. First State Bank & Tr. Co.</u>, 332 Ark. 645, 966 S.W.2d 894 (1998).

Appellate Case: 19-1481 Page: 35 Date Filed: 05/21/2019 Entry ID: 4789737

Adeli's reliance on the alleged statements of Slone were not justifiable or reasonable as a matter of law. Adeli testified that he understood that the terms of the sale between the parties would be reduced to specific written documents which would constitute the contract of the parties (TR 132-133; APX 298-299). The parties expressly agreed that Adeli was responsible for all repairs and that Silverstar would not be liable for any warranties. The parties expressly agreed that the car was sold as-is.

While reasonable reliance is ordinarily a question of fact, it is a question of law when no reasonable jury could reach the conclusion that the buyer justifiably relied. Where the buyer expressly agrees to an as-is contract sale with full responsibility for all repairs, his reliance is not reasonable as a matter of law. Epley v. John Gibson Auto Sales, 2016 Ark. App. 540, 514 S.W.3d 468 (2016) (dismissal with prejudice of buyer's fraud claim against dealership affirmed where the salesman's statement that the car was in good condition was not a specific misrepresentation upon which the purchaser could reasonably rely). In

24

<u>Yarborough v. DeVilbiss Air Power, Inc.</u>, 321 F.3d 728 (8th Cir. 2003),

this Court affirmed summary judgment on a fraud claim under Arkansas

law where the plaintiffs alleged misrepresentations in the negotiations

leading up to a specific written contract.  This Court ruled:

> In the instant case, all the individuals involved
> were sophisticated businessmen represented by
> experienced counsel, and, moreover, all of the
> alleged oral representations concerned matters
> that were explicitly addressed in the subsequent
> alteration of the contract.  In these circumstances,
> we believe that it would be unreasonable to rely
> on an oral guarantee when that guarantee was
> quite obviously not included in the subsequent
> written draft of the contract.  We thus do not
> believe that any reasonable jury could find that
> the plaintiffs' reliance was justifiable.  <u>Cf</u>.  <u>Crowell</u>
> <u>v. Campbell Soup Co.</u>, 264 F.3d 756, 762-64 (8th
> Cir. 2001); <u>Martin v. American Fam. Mut. Ins.</u>
> <u>Co.</u>, 157 F.3d 580, 581-82 (8th Cir. 1998) (per
> curiam); <u>Plymouth Foam Products, Inc. v. City of</u>
> <u>Becker, Minn.</u>, 120 F.3d 153, 157 (8th Cir.
> 1997); <u>Davidson v. Wilson</u>, 973 F.2d 1391, 1401
> (8th Cir. 1992).

<u>Id.</u>, 321 F.3d at 731.

Similarly here, Adeli was an experienced businessman who agreed

in writing that the dealership had no responsibility for any defects

25

discovered after purchase.

Adeli did not inspect or test drive the car. He did not have it inspected by a mechanic of his choice. He bought it sight unseen. Adeli chose not to call Boardwalk before the sale and inquire further. Reliance on the alleged oral misrepresentations was unreasonable as a matter of law given the contract terms to which Adeli agreed.

D.  The ADTPA claim fails as a matter of law because the transaction was in full compliance with the law and the sale was therefore not a deceptive act.

This sales transaction was entirely lawful, fully authorized and in compliance with UCC requirements for warranty disclaimer. The alleged misrepresentation therefore cannot, as a matter of law, constitute an unfair or deceptive trade practice under the ADTPA.

The list of acts made unlawful by the ADTPA are set forth in Ark. Code Ann. § 4-88-107(a). Misrepresenting the condition of a used car is not a specifically listed prohibited act. Adeli's ADTPA claim was predicated on the "catch all" section of that statute: "Engaging in any other unconscionable, false, or deceptive act or practice in business,

26

commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10).  The

elements of a cause of action under this section are:  (1) a deceptive

consumer-oriented act or practice which is misleading in a material

respect, and (2) injury resulting from such act.  Skalla v. Canepari, 2013

Ark. 415, 430 S.W.3d 72 (2013).

As a matter of law, a written contract freely negotiated between the

parties in which the buyer agrees to accept all risk and pay for all repairs

cannot be a deceptive consumer-oriented act.  It fully complies with the

law for disclaimer of express warranties.  Adeli knew he was entering into

such an agreement, accepting all risk that the car might be defective.

See, Epley, supra (affirming dismissal with prejudice of ADTPA claim

based on as-is contract term in car sale).  The ADTPA claim therefore

fails as a matter of law.

II.    THE PUNITIVE DAMAGES AWARD DEPRIVES SILVERSTAR
       OF ITS CONSTITUTIONAL DUE PROCESS RIGHTS AND
       VIOLATES ARKANSAS LAW.

The district court held that the jury's punitive damage verdict

violated Silverstar's due process rights.  The Court reduced the award by

27

$5,300,000. The district court did not explain: why a $500,000 award is constitutional; what constitutional standards were applied to reach that sum; what objective criteria, if any, supported its decision; whether any alternative sums were considered; or why it settled on this number instead of a lesser one. The definitive conclusion of the district court requiring reduction was that the jury's verdict was unconstitutional. The constitutional rationale for the amount of the reduction was unexplained.

Once it decided that the jury's verdict was unconstitutional, the district court should have reduced the award in accordance with the constitutionally acceptable ratio of <u>State Farm Mut. Automobile Ins. Co. v. Campbell</u>, 538 U.S. 408, 123 S. Ct. 1513 (2003), where the Court ruled that a single digit ratio is the outer limit of constitutional acceptability (the <u>Campbell</u> parameter). The <u>Campbell</u> parameter provides the objective constitutional measurement for the reduction of punitive damages missing from the district court's analysis. In every decision since <u>Campbell</u>, this Court has limited punitive damage awards

28

to single digit ratios.  It should do so here.

    A.    <u>Standard of Review</u>

The constitutionality of punitive damages are reviewed de novo.

<u>Trickey v. Kaman Indus. Techs. Corp.</u>, 705 F.3d 788 (8th Cir. 2013).

    B.    <u>Application of the constitutional guideposts requires reduction of the punitive damages to within a single digit ratio of the compensatory damages.</u>

The due process clause prohibits "grossly excessive civil punishment."  <u>Ondrisek v. Hoffman</u>, 698 F.3d 1020, 1028 (8th Cir. 2012).  Punitive damages are grossly excessive if they "shock the conscience" of the court or "demonstrate passion or prejudice on the part of the trier of fact."  <u>Id</u>.  The jury's verdict in this case was fueled by passion and prejudice.  The award shocked the conscience of the district court.  It should shock the conscience of this Court.

The three "guideposts" are:  (1) The degree and reprehensibility of the defendant's conduct; (2) the disparity between actual or potential harm suffered and the punitive damages award (ratio between compensatory and punitive damages); and (3) the difference between the

29

punitive damages award and the civil penalties authorized in comparable cases.  Id., quoting Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 602 (8th Cir. 2005); BMW of N.A., Inc. v. Gore, 517 U.S. 559, 116 S. Ct. 1589 (1996).

In Campbell, the Court established sub-factors to determine the degree of reprehensibility.  These are whether:  (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and, (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. 538 U.S. at 419.  "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."  Id.

Appellate Case: 19-1481     Page: 42     Date Filed: 05/21/2019 Entry ID: 4789737

1. <u>Silverstar's conduct was not reprehensible.</u>

   a. <u>Any loss suffered by Adeli was purely economic.</u>

Adeli's total out-of-pocket expenditures for repairs and related expenses were $18,303.67 (TR 139-140; APX 305-306, 563). He suffered no physical injury or depression. He testified that the sale created tensions with his wife (TR 166; APX 332). He offered no evidence of any non-monetary damages.

   b. <u>Adeli was not financially vulnerable.</u>

Adeli, 47 years of age, was an experienced sophisticated businessman. He was an executive in the mortgage lending business negotiating complicated written contracts (TR 118-119; APX 284-285). He had been a licensed real estate broker in Virginia, Maryland, and the District of Columbia writing real estate contracts and relying on those documents for the completion of real estate transactions and the earning of his commissions (TR 120-121; APX 286-287). He was an experienced buyer and seller of expensive exotic sports cars. (TR 121-124; APX 287-290).

Slone was 22 years of age and in college at the time of the sale (TR 288, 293; APX 454, 459). He had been working in his father's dealership doing various jobs since he was 15 years old (TR 289; APX 455).

Adeli was the more experienced businessman and negotiator. Adeli was more knowledgeable and experienced in sports cars. Adeli was not an unsuspecting consumer mislead by an automobile dealership with superior bargaining position. He was an experienced successful businessman, realtor, mortgage broker, and sports car enthusiast, who was willing to spend $90,000 on an exotic ten year old Italian sports car, without inspecting.

        c.    <u>The alleged misconduct by Silverstar was limited to this transaction only.</u>

The sale of the car by Silverstar was handled exclusively by Slone. It was not part of corporate sales policies or practices. The car had been garaged at Slone's parents' home since acquisition by the dealership two years prior (TR 291-292; APX 457-458).

Silverstar did not perform the PPI. Ordinarily, Silverstar would

32

perform its own inspection. This transaction was completely unique. There was no evidence of any other allegedly fraudulent transaction by Silverstar.

Adeli may rely on Guest's testimony that Silverstar sold other used cars "as is" which may have contained a cracked exhaust. Guest testified that it was difficult to make a comparison because the cars that Silverstar sold do not have the same components as Ferraris. "But, yes, exhausts can have cracks in them. On ten year old cars, they can have leaks, they can have rust." There are "lots of things on used cars that at some point will need to be replaced." (TR 268; APX 434). Those cars were also sold "as-is," with the buyer agreeing to accept responsibility for all repairs. Guest never testified that it was a common practice to not disclose potential repair items or misrepresent the results of a pre-purchase inspection.

      d.    <u>Silverstar's alleged misconduct did not evince a<br>reckless disregard for health and safety of others.</u>

No evidence was presented that Slone knew of, or was informed of, any safety issues regarding the exhaust. Neighbors did not testify that

33

he believed the exhaust was a safety issue or that he told Slone of health or safety concerns. Neighbors testified when asked if a cracked exhaust could be a safety issue: "Perhaps." (TR 205; APX 371). Slone testified that he never smelled gasoline and was not aware of any exhaust issue through his experience driving the car (TR 293; APX 459).

No evidence was presented that <u>this</u> car was dangerous because of the exhaust. Easton testified that the exhaust, the gas leak, and the suspension were <u>potential</u> safety issues. However, he did not testify that any of the these safety issues were manifested in a dangerous condition in this specific car. He testified theoretically that all could involve safety or health concerns under certain circumstances.

Easton testified that the exhaust could be a safety issue if carbon monoxide enters the cabin (TR 46; APX 212). However, no evidence was presented that the alleged exhaust crack had progressed to the point that it posed any danger at all. Adeli testified he had no knowledge whether that was a problem in this car (TR 151; APX 317).

Easton focused on the gasoline leak. Hot exhaust escaping next to

the fuel leak could cause a fire according to Easton (TR 46, 49; APX 212, 215). The gas leak was never an item brought to Silverstar's attention. The gas leak was an entirely separate problem from the exhaust (TR 137-138; APX 303-304). Boardwalk did not detect a gas leak in its inspection. Adeli may argue that Slone should have known of the gas leak because the smell was strong when Adeli received the car, but no evidence was presented that Slone knew, a necessary fact to establish reckless indifference to safety. Adeli admitted there was no evidence that Silverstar had knew of the gas leak (TR 138; APX 304). The gas leak could have occurred during shipment of the car (TR 136; APX 302).

The Boardwalk PPI, a month before the sale, did not discover a gas leak. The fact that Slone drove the car on weekends is of no significance because all of those drives were prior to the Boardwalk inspection. The only time Slone drove the car after the Boardwalk inspection was off of the truck and into the garage, and from his parents' garage to the dealership, a distance of 10 to 15 miles (TR 297-298; APX 463-464).

Appellate Case: 19-1481     Page: 47     Date Filed: 05/21/2019 Entry ID: 4789737

Before Silverstar can recklessly disregard a safety hazard, it must know of it. It did not.

Easton also emphasized the suspension problem as a potential safety concern, but no evidence was presented that Silverstar had any knowledge of a suspension related problem. This was not in Boardwalk's PPI. Adeli has never repaired the suspension problems identified by Easton (TR 139; APX 305). Adeli continues to drive the car without making this allegedly necessary safety repair, having driven the car for 7,000 miles since purchase (TR 124; APX 290).

e. <u>Silverstar's alleged misrepresentations did not rise to the level of intentional malice, trickery, or deceit.</u>

Adeli's case that Slone lied to him was based solely on the exhaust, but Slone never made any affirmative statements about the exhaust. Adeli did not testify that Slone told him that the exhaust had been inspected and had no potential problems. Adeli, as an experienced buyer and seller of exotic sports cars, should have known that an exhaust crack was a recurring problem in this model Ferrari and can start as a

36

beginning issue developing problems later. He claimed that he learned this fact through research after the sale (TR 150-151; APX 316-317).

Slone testified that Neighbors told him the exhaust was beginning to have an issue which would come to fruition in the future. However, "the car was completely fine with the repairs (as accepted) and could be driven safely." (TR 278; APX 444). Slone testified that he was not told that the exhaust had a "crack." (TR 277-278; APX 443-444).

When Slone paid Boardwalk $11,671 for repairs on October 13, 2016, he was handed the report which Slone understood to be the PPI report (TR 301; APX 467). That document did not list the exhaust as a declined repair. It did however list the TPMS as a declined repair. This was the only document the customer would receive. Kenneth Ambrose, Boardwalk's CEO (TR 189-191, 214-219; APX 355-357, 380-385).

Slone e-mailed Boardwalk on November 15, 2016 confirming that Neighbors told him "there was a beginning crack into the exhaust" which "was not included in the PPI." (APX 559). Neighbors responded by forwarding an internal Boardwalk document titled "Recommended

37

Services." "Exhaust headers" were listed and noted that Silverstar declined the repair (APX 559, 561). That document did not state the immediacy of the need for repair or any safety issues (TR 283; APX 449). This document is typically never given to customers (TR 190-191, 214-219; APX 356-357, 380-385).

After Adeli received the car and voiced his concerns to Silverstar, the matter was investigated by Guest. Based on Adeli's concerns, Guest considered whether to accept Adeli's proposal for rescinding the transaction and believed that it might be the way to go (TR 243-244; APX 409-410). He called Neighbors to investigate.

Neighbors told him that the complaints raised by Adeli could not be accurate based on Boardwalk's inspection. Neighbors told him that Boardwalk had performed everything necessary to make the car ready for the next buyer (TR 265-266; APX 431-432). Guest's investigation, conducted after the sale and after Adeli's expressed dissatisfaction, confirmed Slone's version of the Neighbors communications. Based on this investigation, Guest rejected the offer to rescind the sale (TR 251-

252; APX 417-418).  Neighbors did not contradict Guest's testimony.
He had no recall of the conversation, although his notes reflect a call
with Guest (TR 208-209; APX 374-375, 566).

    2.    <u>Comparison of the compensatory to the punitive damages requires further reduction of the punitive award.</u>

    The second factor, disparity, is the ratio of the punitive damages
award compared to the actual or potential harm inflicted on the plaintiff.
<u>Gore</u>, 517 U.S. at 580.  The key inquiry is whether the award and the
harm bear a "reasonable relationship" to one another.  <u>Id</u>.  The Court
rejected the notion that any bright-line, mathematical formula could be
applied to determine a constitutionally acceptable ratio.  <u>Id.</u> at 582-83.
The Court did note, however, that when the ratio between the harm and
award is "breathtaking," such as when the ratio is 500 to 1, there will
surely be a question as to the constitutional validity of the award.  <u>Id.</u> at
583.  In <u>Campbell</u>, the Court defined the range of acceptable ratios.
"[I]n practice few awards exceeding a single-digit ratio between punitive
and compensatory damages, to a significant degree, will satisfy due

39

process." Campbell, 538 U.S. at 425.  A 1:4 ratio of compensatory

damages to punitive damages "might be close to the line of

constitutional impropriety."  Id.

The decisions of this Court post-Campbell have consistently

adhered to the Campbell parameter.  In Ondrisek v. Hoffman, supra, this

Court reduced a punitive damage award to a 1:4 ratio.  The defendant in

that case, a notorious cult leader, was held liable for beating his

followers, threatening their lives, forcing them to work without pay, and

starving them.  698 F.3d at 1023-24.  The jury awarded plaintiffs

$3,000,000 each in compensatory damages and $30,000,000 in punitive

damages.  The Court recognized the exceptionally reprehensible conduct

of the defendant, but nevertheless held that due process required a

reduction of the punitive damages from the 1:10 ratio to a 1:4 ratio.

In Wallace v. DTG Operations, Inc., 563 F.3d 357 (8th Cir. 2009),

this Court applied the Campbell parameter to reduce a $500,000

punitive damage award in light of a $30,000 compensatory award.  The

Court again used the 1:4 ratio as the constitutional standard and

40

reduced the punitive damages to $120,000.  This Court held:

> As such, a single-digit multiple should be an outer
> limit on Wallace's award.  See State Farm Mut.
> Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425,
> 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) ("[I]n
> practice, few awards exceeding a single-digit ratio
> between punitive and compensatory damages, to a
> significant degree, will satisfy due process.");
> Williams v. ConAgra Poultry Co., 378 F.3d 790,
> 799 (8th Cir. 2004) ("In the absence of extremely
> reprehensible conduct against the plaintiff or some
> special circumstance such [as] an extraordinarily
> small compensatory award, awards in excess of
> ten-to-one cannot stand.").

Wallace v. DTG Operations, Inc., 563 F.3d at 362-363.

Although not restricted by any exact mathematical formula, the
"general contours" of this Court's decisions consistently follow the
Campbell parameter.

> Notwithstanding the absence of a simple formula
> or bright-line ratio, the general contours of our
> past decisions lead to the conclusion that a low
> ratio is called for here.  See Williams v. ConAgra
> Poultry Co., 378 F.3d 790 (8th Cir. 2004)
> (remitting the punitive damages award to an
> amount equal to the compensatory damages award
> of $ 600,000); Stogsdill, 377 F.3d at 834
> (approving a ratio of 1:4 compensatory damages
> to punitive damages as an upper limit where the

41

compensatory award was $ 500,000); <u>Morse v. Southern Union Co.</u>, 174 F.3d 917, 925-26 (8th Cir. 1999) (upholding close to a 1:6 ratio where the compensatory award was only $ 70,000).

<u>Boerner v. Brown & Williamson Tobacco Co.</u>, 394 F.3d 594, 603 (8th Cir. 2005).

The jury's award of punitive damages here was 849 times the compensatory damages award. The district court's award of $500,000 was a 1:73.15 ratio with the compensatory award. If compared to the total damages awarded (compensatory and incidental damages combined), the ratio was 1:24.75. This ratio is completely outside the protection of due process.

      a.    <u>The punitive damages should be compared to the compensatory damages only, not the incidental and compensatory damages combined.</u>

The district court held that the comparison should be to the total of both compensatory and incidental damages (ADD 009, at n. 2; APX 548). This analysis is flawed because the incidental damages were awarded only for breach of express warranty, a claim which does not support an award of punitive damages. <u>Bennett v. Bumble Bee Foods,</u>

42

Appellate Case: 19-1481    Page: 54    Date Filed: 05/21/2019 Entry ID: 4789737

LLC, 2014 U.S. Dist. LEXIS 188460 (W.D. Ark. Oct. 8, 2014); L.L. Cole & Son, Inc. v. Hickman, 282 Ark. 6, 665 S.W.2d 278 (1984). The ADTPA limits damages to actual financial loss, punitive damages are therefore not allowed. Bennett, 2014 U.S. Dist. LEXIS 188460, at *6. Only the fraud claim could support punitive damages under Arkansas law. The constitutional analysis must compare the punitive damages to the actual damages (regardless of the label attached) which were awarded for the conduct which warranted the imposition of punitive damages. The only conduct supporting an award of punitive damages was the alleged omission regarding the exhaust. The jury so concluded by awarding the approximate amount of the exhaust repair for compensatory damages. The incidental damages for breach of warranty were completely unrelated to the alleged misrepresentation. The comparison between "general damages" (Campbell, 538 U.S. at 426) or "actual harm" (Gore, 517 U.S. at 580) refers to the "actual" or "general" damages flowing from the conduct justifying punishment. To satisfy due process, there must be a nexus between the compensatory damages awarded for the

43

punishable conduct and the punitive damages.  This is the only way that the award can satisfy due process.  Accordingly, this Court should reduce the punitive damages awarded by the district court, by a comparison to the compensatory award, $6,835.

      b.   <u>The compensatory damage award was not small or nominal.</u>

The jury awarded Adeli more in compensatory damages for fraud than he proved.  The evidence of the repair of the exhaust was $6,036 (TR 111-115; APX 277-281, 562).  The jury awarded $6,835 in compensatory damages.  With the incidental damages combined, the jury awarded Adeli a total of $20,201.  His testimony was that the total amount of claimed damages was $18,303.

Adeli's award of actual damages was therefore not small or nominal.  He received more than he proved.  In <u>Wallace v. DTG Operations, Inc.</u>, <u>supra</u>, this Court discussed the argument that a "small" compensatory award may justify a punitive damage verdict in excess of a single digit ratio.  This Court held that a $30,000 compensatory award "is not a nominal amount that might excuse a higher ratio."  563 F.3d at

44

362.

In Quigley v. Winter, 598 F.3d 938 (8th Cir. 2010), the jury

returned with a compensatory verdict of $13,685, the total amount of

damages proven at trial. The jury awarded $250,000 in punitive

damages. This Court held that $13,865 is not a nominal amount, and

affirmed the district court's reduction of punitive damages. 598 F.3d at

955.

Adeli received the full amount of his actual damages and more.

The fact that Adeli's economic damages were $18,303, should not cause

a departure from the Campbell parameter.

      c.    Grabinski does not support the district court's
               punitive damage award.

The district court relied on Grabinski v. Blue Springs Ford Sales,

Inc., 1998 U.S. Dist. LEXIS 17015 (W.D. Mo. 1998), aff'd., 203 F. 3d

1024 (8th Cir. 2000), cert. denied 531 U.S. 825 (2000) (ADD 012; APX

551). Grabinski was decided under Missouri law, which is directly

contrary to Arkansas authority. Jim Ray, Inc. v. Williams, 99 Ark. App.

315, 260 S.W.3d 307 (2007), is the controlling Arkansas authority,

45

discussed in the following section.

Grabinski is factually distinguishable.  The dealer sold the plaintiff a vehicle that it knew had been wrecked.  The dealer coerced the consumer into signing a junk affidavit to avoid having to disclose this information to the consumer.  The dealer had engaged in this conduct before and had been warned to stop.  203 F.3d at 1025.  The affidavit conduct was a persistent pattern employed to insulate itself in the sale of vehicles it knew were riddled with defects.

In this case, quite to the contrary, there is no pattern and practice evidence.  This was one transaction, Silverstar had the vehicle inspected, and there was a difference in testimony as to what Boardwalk related to Silverstar about that one time inspection on a one time sale of a unique car.

This Court ruled in Grabinski that the jury's verdict was constitutional.  The district court in this case ruled that the jury verdict was unconstitutional.  Grabinski is not authority for the appropriate reduction or ratio when the jury reaches an unconstitutional excessive

46

punitive damages verdict.  Campbell is the controlling authority for such a constitutional analysis.

Grabinski was decided before Campbell.  Grabinski evaluated the constitutionality of the jury's verdict in light of the guideposts announced in Gore.  Campbell took the Gore guideposts further and declared that the constitutionally acceptable parameter is a single digit ratio of compensatory to punitive, and that 1:4 is the likely outer limits of constitutionality.  In every case since Campbell, this Court has restricted punitive damages awards to single digit ratios, and generally to the 1:4 ratio.  It is not a matter of overruling Grabinski.  The law has evolved since Grabinski, such that it has limited precedential value to this case.  Grabinski applied the principles of Gore.  Campbell fine tuned Gore, providing specific objective criteria for the comparison guidepost. Grabinski did not have the benefit of the Campbell parameter.  The district court erred by comparing the compensatory/punitive damages in a general sense, without following the specific guidelines established by the Court in Campbell, and followed by this Court ever since.

47

3.     <u>The punitive damages award is grossly disproportionate to potentially applicable Arkansas civil penalties.</u>

The Arkansas civil penalties for a one time alleged misstatement about the condition of a used car would never justify a $500,000 punishment. The jury found a one time violation of the ADTPA. The ADTPA has a civil enforcement procedure by the attorney general. Ark. Code Ann. § 4-88-113. The maximum civil penalty assessed for a single ADTPA violation is $10,000 per violation.

The district court also relied on Ark. Code Ann. § 4-88-113(b) which permits a court, upon petition of the attorney general, to order the suspension or forfeiture of licenses, permits, or authorization to do business. This is an enforcement mechanism of the attorney general obviously for systemic repeated violation uncorrected by the lesser penalty. In <u>Gore</u>, the Supreme Court ruled that the business closure possibility is not a valid penalty comparison absent proof that such an extraordinary sanction was necessary because lesser sanctions would not succeed in changing the defendant's conduct. "In the absence of a history of noncompliance with known statutory requirements, there is no

48

basis for assuming that a more modest solution would not have been sufficient[.]" 517 U.S. at 584-5. There is no such proof in this case.

Ark. Code Ann. § 4-88-113(f) is the sub-chapter applicable to private rights of action. It restricts recovery to "actual financial loss." No civil penalties may be awarded. Class actions are prohibited. "[A] claimant must prove individually that he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter." § 4-88-113(f)(2). The Arkansas legislature expressed its intent under the ADTPA that recovery by a private litigant is limited to his actual financial loss and not any penalty.

The district court also relied on a section of the ADTPA stating that a "person who knowingly and willfully commits an unlawful practice under this chapter shall be guilty of a Class A misdemeanor," Ark. Code Ann. § 4-88-103, which is punishable up to a $2,500 fine. Ark. Code Ann. § 5-4-401(b)(1). Aside from the fact that this is a criminal, not a civil penalty, the amount does not justify the $500,000 punitive award

49

in this case.

In <u>Jim Ray, Inc.</u>, <u>supra</u>, the court analyzed comparable Arkansas civil penalties, including all those relied on by the district court. The court concluded that the range of comparable sanctions was approximately $15,000 – $40,000. 99 Ark. App. at 324-325. This opinion of the Arkansas Court of Appeals should be given considerable weight by this Court.

C.    <u>The punitive damages award is not authorized by Arkansas law.</u>

1.    <u>The large punitive damages cannot stand under Arkansas state law criteria.</u>

The Arkansas courts apply a two-step process in reviewing punitive damages: (1) whether the award is consistent with state law; and (2) whether it violates the Due Process Clause. In reviewing the first step, the courts have said

> [w]e consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. Punitive damages are a penalty for conduct that is malicious or perpetrated with the deliberate intent

50

to injure another. When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. It is important that the punitive damages be sufficient to deter others from comparable conduct in the future.

Allstate Ins. Co. v. Dodson, 2011 Ark. 19, 28, 376 S.W.3d 414, 432, quoting Advocat, Inc. v. Sauer, 353 Ark. 29, 50, 111 S.W.3d 346, 357-58, citing Routh Wrecker Service v. Washington, 335 Ark. 232, 240-241, 980 S.W.2d 240, 244 (1998) (citations omitted).

The punitive damage award in this case is contrary to Arkansas law. In examining the enormity of the wrong, the Arkansas courts look to whether the defendant knew or should have known its conduct posed an extreme danger to the plaintiff. See Union Pacific R.R. v. Barber, 356 Ark. 268, 300, 149 S.W.3d 325, 346 (2004). Here, Adeli contended the exhaust posed a potential safety risk to the vehicle's passengers. However, there is no evidence that Silverstar had any knowledge of such danger.

Appellate Case: 19-1481    Page: 63    Date Filed: 05/21/2019 Entry ID: 4789737

Slone, who was young and untrained in vehicle mechanics (APX 273), testified he relied on Neighbors. Neighbors did not testify he explained the consequences of foregoing the exhaust repair, much less that it posed a safety risk to the vehicle's passengers. Indeed, when asked this question, Slone testified, "They (Boardwalk) said the vehicle was ready for the next owner whenever I arrived to pick it up" (APX 282), and when asked directly if he knew whether a crack in the exhaust presented a safety issue for the vehicle, he testified "I do not know the answer to that, no, sir" (APX 283). There being no evidence that Silverstar knew the condition of the car posed any risk to its passengers, the enormity of the wrong is not substantial.

There also is no evidence of malicious intent. In <u>Union Pacific</u>, the Arkansas Supreme Court pointed to the railroad's development of a corporate policy that placed profits before the public's safety. Glaringly absent from Adeli's case is any motive on the part of Silverstar to defraud Adeli. Silverstar made approximately $12,000 in repairs to the $90,000 vehicle. Repair of the exhaust would have amounted to just

52

over $5,000, which is not significant when compared to the repairs it had already made and the overall cost of the vehicle. Assuming Neighbors testimony is true, that he told Slone the exhaust required repair, Adeli presented no evidence as to why Slone would have declined the repair with any intent to later deceive Adeli or any other customer. Indeed, Slone testified that his intent in declining to repair the exhaust was driven by Neighbors's comment that it was a beginning problem that did not need to be fixed at that time. Slone testified he did not disclose a crack in the exhaust to Adeli because he was never told there was one. While the jury may have believed Slone had enough knowledge to have disclosed a crack to Adeli, there is an no evidence that Slone acted maliciously.

There is also no evidence of the financial and social condition and standing of Silverstar, another factor considered by the court in <u>Union Pacific</u>. While Adeli's counsel portrayed Silverstar as a profitable car dealership, Adeli presented no evidence of Silverstar's net worth such that there is any indication that the punitive award could have the effect

53

of deterring future conduct.

Taken together, the award of punitive damages was not appropriate in this case as it is inconsistent with Arkansas law, and the district court's inquiry should have began and ended here.

2. The Arkansas courts consistently adhere to the Campbell parameter.

The punitive award also violates due process. In Jim Ray, Inc., supra, decided on very similar facts, the Arkansas court conducted a due process analysis based on the three guideposts.

Regarding reprehensibility, the Arkansas court analyzed the conduct of the car dealer. There, the dealer deceived a customer into paying more for a vehicle than the sticker price and similarly tricked the customer into purchasing a warranty under the auspices that he had to do so. 99 Ark. App. at 321-22, 260 S.W.3d at 311. The court noted that there was evidence of a pattern and practice of such behavior. 99 Ark. App. at 321-22, 260 S.W.3d at 311. Here, there is no evidence of any other transaction like this one. Silverstar's conduct involved one transaction with Adeli, not a course of dealing with him and others

54

involving many bad acts over time.

In further evaluating reprehensibility, the court also considered the type of harm. In that case, as here, the harm was purely economic, not physical, nor was there evidence of indifference to Adeli's health or safety. As discussed, there is no evidence Silverstar had any knowledge that a crack in the exhaust posed a health or safety risk to Adeli. Silverstar could not have been indifferent to Adeli's health or safety when it was not aware its conduct posed such a risk. Ultimately, the court in Jim Ray, Inc. determined the dealer's actions were neither accidental nor malicious and fell within the lower range of reprehensible behavior. 99 Ark. App. at 322, 260 S.W.3d at 311.

The Arkansas court then turned to the ratio, citing Campbell that few awards exceeding a single-digit multiplier will satisfy due process. Importantly, the court noted that

> We have approved ratios greater than a single
> digit in cases of extreme emotional distress or
> humiliation, a significant disparity of bargaining
> power, ongoing racial animus that destroyed a
> business, and a "nightmarish" situation involved
> an improper arrest. "The precise award in any

55

case, of course, must be based upon the facts and
circumstances of the defendant's conduct and the
harm to the plaintiff."

Jim Ray Inc., 99 Ark. App. at 323, 260 S.W.3d at 311-12, citing

Campbell, 539 U.S. at 425.

Importantly, after its de novo review, the court was "firmly

convinced that this case falls within the mine-run of disputes where a

single-digit ratio best comports with due process." Jim Ray Inc., 99 Ark.

App. at 323, 260 S.W.3d at 312. The court noted that the dealer's

action were not particularly egregious and that this case did not even

come close to the fact patterns presented in prior cases. The court

noted, by way of example, that there was no significant disparity in

bargaining power, an unsophisticated consumer, or a mother's right to

insurance benefits following the death of a young-adult son as there had

been in other cases. Id. At bottom, the court recognized that "This case

is about fraud in buying a pick-up" with "approximately $4,500.00 of

purely economic harm from a routine commercial transaction, which he

(the plaintiff there) initiated." Id. While the court determined the

56

dealer's action warranted some punishment, all of the material circumstances, which are arguably greater than those here, did not move the needle in that case beyond the single-digit-ratio continuum. Id.

Finally, the Jim Ray, Inc. court considered whether comparable sanctions were out of keeping with the punitive award in that case. It noted available fines ranged from $1,000 to $10,000, and it recognized that punitive awards in other cases like it had ranged between $5,000 and $10,000 at most. Evaluating all three guidelines, the court reduced the punitive award in that case from $75,000 to $30,000 which represented a ratio of about 1:7. Jim Ray Inc., 99 Ark. App. at 326, 260 S.W.3d at 313.

Here, even taking into account the district court's reduction, the ratio of damages to punitive damages (assuming both compensatory and incidental damages are considered) is 1:25, well beyond the single-digit multiplier recommended in Campbell and followed by the Arkansas courts.

The punitive damages in this case are contrary to Arkansas law. If

57

deemed appropriate, they should be reduced to a single-digit multiplier.

See, Advocat, Inc. v. Sauer, supra.

        3.    The Grabinski case, decided under Missouri law, is contrary to Arkansas law.

The analysis in Grabinski decided under Missouri law, is directly contrary to the Arkansas law analysis in Jim Ray, Inc.  The reliance by the district court on Grabinski to support a ratio greater than single digits is therefore wrong.

58

## <u>CONCLUSION</u>

The judgment of the district court should be reversed with directions to dismiss Adeli's complaint with prejudice. Alternatively, the judgment for incidental breach of warranty damages should be reversed, with directions to dismiss all other claims, including the punitive damages claim, with prejudice. Alternatively, the punitive damage award should be reduced to no more than $61,515.

/s/ David M. Donovan
DAVID M. DONOVAN (81184)
STACI DUMAS CARSON (2003158)
WATTS, DONOVAN & TILLEY, P.A.
200 RIVER MARKET AVE., STE. 200
LITTLE ROCK, AR 72201-1769
(501) 372-1406
(501) 372-1209 FAX
david.donovan@wdt-law.com
staci.carson@wdt-law.com

59

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Eighth Circuit Rule 28A(c), the undersigned certifies that this brief complies with the applicable type-volume limitations and that exclusive of the portion exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 11,478 words. This certificate was prepared in reliance on the word count of the word processing system, WordPerfect X5, used to prepare this brief.

Pursuant to Eighth Circuit Rule 28(A)(d), the undersigned certifies that a copy of the brief has been scanned for viruses and is virus-free.

Appellate Case: 19-1481     Page: 72     Date Filed: 05/21/2019 Entry ID: 4789737

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Mr. William T. Crowder
wcrowder@crowdermcgaha.com

Mr. Corey D. McGaha
cmcgaha@crowdermcgaha.com

Mr. Nicholas A. Migliaccio
nmigliaccio@classlawdc.com

Mr. Jason S. Rathod
jrathod@classlawdc.com

/s/ David M. Donovan
DAVID M. DONOVAN (81184)
STACI DUMAS CARSON (2003158)
WATTS, DONOVAN & TILLEY, P.A.
200 RIVER MARKET AVE., STE. 200
LITTLE ROCK, AR  72201-1769
(501) 372-1406
(501) 372-1209 FAX
david.donovan@wdt-law.com
staci.carson@wdt-law.com